## Smilow et al., Appellants, *v.* Dickerson.

Argued May 27, 1947. Before Maxey, C. J., Drew, Linn, Stern, Patterson and Stearne, JJ.

reargument refused November 10, 1947.

*Abraham L. Shapiro,* with him *Shapiro & Shapiro,* for appellants.

*Richardson Dilworth,* with him *James A. Sutton* and *Murdoch, Paxson, Kalish & Dilworth,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, October 2, 1947:

The pivotal question raised by this appeal is whether the parol testimony received in evidence contradicted or varied the terms of a written contract or whether such evidence established that the written contract was never intended to be operative between the parties and never in fact had any legal existence as a contract.

The appeal is from a decree in equity of the Court of Common Pleas No. 4 of Philadelphia County, dismissing a bill for an accounting under a written contract of employment and the transfer of defendant's set-off and counterclaim to the law side of the court.

On April 27, 1944, Sylvan D. Broder (plaintiffs' decedent) and E. S. Dickerson, Jr., individually and trading as The Dickerson Company, entered into a written contract whereunder Broder was employed as Dickerson's representative in South and Latin America for the purpose of initiating and stimulating Dickerson's business as importer and exporter in those countries. The term of the contract was twelve months, subject to

cancellation by either party on 90 days notice. Broder's compensation was fixed at $250 semi-monthly, plus reasonable traveling expenses. The contract provided that Broder was to devote his time *exclusively* to Dickerson's business.

Pursuant to the terms of the contract, Broder went to South America early in 1944 and purchased a large quantity of chocolate for Dickerson. His services were satisfactory and he was paid the agreed compensation. In October 1944, Dickerson contemplated sending Broder to South America on a second trip when it was discovered that Broder had breached his agreement to render service *exclusively* to Dickerson. It was disclosed that Broder had entered into an agreement with a competitor company, in which Broder was interested, to be its exclusive sales agent in South America; also that Broder had been marketing one of his own inventions to increase power of gasoline and had, in addition, been employed by a chemical company to survey chemical industries in South America. Broder admitted his violations of the agreement but excused himself because he was indebted to the majority stockholder of the competitor corporation in the sum of $10,000 and was unable to repay his indebtedness. Dickerson was desirous of continuing the employment but was insistent that Broder should serve him *exclusively*. He required an "iron clad" agreement, with provisions for his protection, in the event that Broder again violated his agreement.

On December 31, 1944, Broder met with Dickerson at the latter's home, together with Dickerson's attorney, accountant and wife. Dickerson agreed to pay off the indebtedness of Broder, who in turn agreed forthwith to relinquish all other outside business activities. The parties then evolved an extraordinary scheme to accomplish their purpose. What they proposed to do was to set up on Dickerson's books fictitious expense payments aggregating $10,000, which, in effect, would transfer Dickerson's payment of Broder's indebtedness to a

Federal income tax allowance. Apparently realizing the irregularity of such fictitious procedure, and as a cautionary measure against Federal civil or criminal liability, *the agreement was made conditional upon its approval by Dickerson's Washington tax lawyer.*

In order to effectuate such scheme, the parties executed a written agreement on *December 31, 1944,* which they predated *July 24, 1944.* Parol evidence is admissible to prove the actual date of a writing even though it be different from the date inserted in the writing itself: *Davis v. Cauffiel,* 287 Pa. 420, 135 A. 107, and the cases therein cited. This agreement provided that it was ". . . amending and modifying our former agreement of (sic) April 12, 1944. . . ." The term of the contract was *"the year 1944";* that at the expiration of the term it should be continued until thirty (30) days notice was given by either party for termination. Compensation was fixed at 6% on the gross sales in 1944 and thereafter until the contract was terminated. *However, on the date of the actual execution of this agreement, December 31, 1944, Broder had already performed all his services for that fiscal year and had already been paid in full. It was shown that 6% of the gross sales from July 24, 1944 until December 31, 1944, amounted to the $10,000 indebtedness plus the compensation Broder had already received.* It is thus readily discernible that if such a nefarious device had been approved by the tax expert and passed by the Federal Income Tax Department, it would have resulted in Dickerson passing the payment of Broder's indebtedness over to the United States Government as an expense allowance and leaving the parties in the same position as they were before.

Further to effectuate the parol agreement entered into *on December 31, 1944,* Dickerson *predated* a termination notice dated *November 29, 1944,* which provided that Broder's service would end *"as of the end of the year 1944."*

The parties having thus, *subject to approval of the tax expert,* placed themselves in the position of having paid off Broder's debt at Federal expense, and having cancelled their fictitious contractual obligation, and with no further obligation or duty as respects Broder's salary, on December 31, 1944, executed a third agreement which they *postdated January 2, 1945.* Under its terms Broder undertook to go to South America that week or shortly thereafter; and that his "compensation shall be reasonable traveling expenses plus *such percentage of profits resulting from* [*his*] *trip as* [*Dickerson*] *may later fix*" (emphasis supplied). Dickerson then gave Broder $1,600 on account of his traveling expenses.

Broder left for South America on January 4, 1945, and was killed in an airplane accident en route on January 8, 1945.

The personal representatives of Broder brought a bill in equity for an account under the provision of the contract of April 27, 1944, as modified by the writing dated July 24, 1944. Dickerson filed an answer, and at the trial established the facts as recited. Dickerson also filed a set-off and counterclaim. It was averred by Dickerson that before the first trip Broder had been instructed to take out a travel accident insurance policy for $25,000 in favor of Dickerson as employer. Broder secured the policy, with funds of Dickerson, but changed the beneficiary to Broder's wife who collected the insurance upon his decease. Dickerson also demanded the return of all unexpended moneys from the $1,600 traveling expenses advanced on December 31, 1944.

The court below, as above stated, dismissed the bill and transferred defendant's set-off and counterclaim to the law side of the court under the Act of June 7, 1907, P. L. 440, 12 PS 1228 and Rule of Civil Procedure No. 213.

It is apparent that this was a cumbersome, fraudulent, fictitious transaction. The parties signatory never

intended the writing bearing date July 24, 1944, but actually signed December 31, 1944, to be in truth and in fact a binding contract between them. What they really intended to accomplish, as before stated, was to relieve Broder from his obligation; falsely to charge that amount to the United States Government as a tax deduction; forthwith to cancel all future obligations thereunder; to insure Broder's *exclusive* service, and to compensate him in whatever sum Dickerson should thereafter determine. As Broder stated, when, on December 31, 1944, he signed the agreement dated January 2, 1945: "This is a blank check."

At the trial plaintiffs offered the two written papers dated respectively April 27, 1944 and July 24, 1944 and rested. They relied solely upon the written terms of the agreement. Had the paper of July 24, 1944 been unconditionally executed and delivered and intended to be a true contract between the partis then, under *Gianni v. R. Russell & Co., Inc.*, 281 Pa. 320, 126 A. 791, and the numerous cases following it, defendants could not be heard to contradict or alter its written terms. *But the paper was not in fact so unconditionally executed and delivered.* It was specifically agreed that the terms of the agreement, and the entire scheme, was *subject to the approval of one Robert Ash, Esquire, a tax attorney in Washington, D. C.* Broder was killed before the tax expert had an opportunity to approve the contract, and consequently the conditional execution and delivery became ineffectual. This case is ruled by *Eaton v. New York Life Insurance Company of New York,* 315 Pa. 68, 172 A. 121, where the opinion was written by our present Chief Justice. There a policy of life insurance was presented by the beneficiary to the insurance company for payment. The policy was regular on its face and acknowledged receipt of the first premium. Parol evidence was admitted to show that no premiums had been actually paid, and that delivery of the policy was

made to the insured *for inspection only* and was not intended to have been the delivery of an enforceable insurance contract.

Mr. Justice MAXEY said (p. 78) : "Whether or not there was a legally effective delivery of this policy, i. e., a final jural act, depends on whether or not the minds of the agent and the insured met on the matter of the finality of the delivery. Did the agent and the insured *intend* the former's manual delivery of the policy to the latter, to be an absolute delivery and acceptance? The answer to this is to be found not only in what was *done* but in what was *said*. What was merely done being not conclusive of the issue, what words accompanied the deeds of manual delivery and acceptance, respectively, become important. These deeds *unaccompanied by words* would indicate an absolute delivery and acceptance. If there were accompanying words, these *might* show that the delivery and acceptance were only conditional. . . ."

Again (p. 82) : "[There was raised] a strong presumption that there had been a legally operative delivery of the policy. Defendant, however, had a right to present competent evidence for the purpose of proving that the policy had been delivered for inspection only, i. e., conditionally and not absolutely. What the agents offered to testify, first, as to what *they said* about the policy's delivery, contemporaneously with the handing of this policy to the insured, and, secondly, as to what the *insured said* about its acceptance, contemporaneously with taking this policy into her possession, is competent evidence to prove the character of the delivery. . . ."

That case rested upon sound principle. The parol evidence rule has no application where parol testimony reveals that the instrument never had any legal existence or binding force. The written instrument in the instant case is exactly what the parties intended it to be, and only that. No effort is made by parol testimony to vary or contradict its terms.

In the leading English case of *Pym v. Campbell*, 6 El. & Bl. 370, it is said: "The distinction in point of law is that evidence to vary the terms of an agreement in writing is not admissible, but evidence to shew that there is not an agreement at all is admissible:" *Rogers v. Hadley,* 2 H. & C. 227, 249; *Lister v. Smith,* 3 Swabey & Tristram 282; *Nichols v. Nichols,* 2 Phillimore 180; *Pattle v. Hornibrook,* 1 Ch. 25; See also: Pollock on Contracts, 11th Ed. p. 202, and 1 Greenleaf Evidence, 305c, p. 439.

It was said by Justice HARLAN in *Burke v. Dulaney,* 153 U. S. 228: "The rule that excludes parol evidence in contradiction of a written agreement presupposes the existence in fact of such agreement at the time suit is brought. But the rule has no application if the writing was not delivered as a present contract . . . ," and parol evidence was admissible to show that there never was any concluded, binding contract entitling the party who claimed the benefit of it to enforce its stipulations.

Wigmore on Evidence, Vol. IX, section 2410, states ". . . the finality of the writing as a jural act depends upon the circumstances of each case; that it may be left to depend on a third person's assent or upon any other precedent condition. . . ." It is stated that the doctrine of *Pym v. Campbell,* supra, is completely accepted in the United States. In note 3, the Pennsylvania case of *Eaton v. New York Life Insurance Company of New York,* supra, is cited.

It was established by disinterested witnesses that the writing bearing date July 24, 1944, was executed and delivered with the distinct declared intent, understanding and agreement of both parties that it would not be effective unless or until the tax expert approved of the proposed advancement of $10,000 (which was never made) as a business expense from Dickerson's 1944 Federal income taxes. This condition, because of the death of Broder, was never fulfilled. What was therefore said

contemporaneously with the execution and delivery of the paper was competent evidence.

The decree of the court below is affirmed at the cost of appellants.

---

CONCURRING OPINION BY MR. JUSTICE HORACE STERN:

I concur in the decision as well as in the opinion of Mr. Justice ALLEN M. STEARNE. I wish merely to stress the non-contested fact that the agreement dated July 24, 1944, but actually executed on December 31, 1944, was wholly fictitious and not intended by the parties to bind either of them; in fact the period which it purported to cover had already expired when it was entered into. It was prepared for the sole purpose of deceiving and defrauding the United States government.

It is elementary that evidence is always admissible to attack the integrity of an instrument *as a whole* and to show that an apparently valid agreement was not in fact intended by the parties to be a genuine and binding contract. Under such circumstances the rule against attempting to alter the terms of a written agreement by parol evidence has no application whatever.

---

DISSENTING OPINION BY MR. JUSTICE DREW:

I do not agree with the majority view. In my opinion it imperils every written contract where, as here, the parties, without any fraud or mistake, have deliberately put their engagements in writing; further it opens the door wide to the perpetration of fraud of the worst type. To permit this defendant, without alleging or attempting to prove fraud, accident or mistake, to vary and contradict, so as to destroy, the written instrument of July 24, 1944, completely nullifies the parol evidence rule as enunciated by this Court in *Gianni v. Russell & Co., Inc.,* 281 Pa. 320, 126 A. 791, and strictly followed by us ever since. If there is a case to which that rule should be strictly applied, I am certain this is that case.

Particularly is that so since the parties expressly provided in their writing of July 24, 1944, that it *"constitutes the entire definition of the relationship between [them]."*

I believe that a more detailed statement of the facts than that set forth in the majority opinion is necessary to fully understand the controversy here for determination. Louis Smilow and Nathan A. Rothstein, Ancillary Executors of the Estate of Sylvan D. Broder, Deceased, filed a bill in equity for an accounting and compensation alleged to be due to plaintiffs' decedent by defendant, under the terms of written contracts of employment dated April 27 and July 24, 1944. After hearing on plaintiffs' bill; defendant's answer, set-off and counterclaim; and plaintiffs' reply, the learned chancellor dismissed the bill and transferred the set-off and counterclaim to the law side of the court. The court en banc thereafter entered a final decree dismissing plaintiffs' exceptions and affirming the action of the chancellor. This appeal by plaintiffs resulted.

The following evidence was offered by plaintiffs: On April 27, 1944, Broder, plaintiffs' decedent, entered into a written contract with defendant, who is and has been engaged for about twenty years in the importing and exporting business in Philadelphia. This contract, which was to continue for twelve months, subject to termination by either party on ninety days' written notice, provided, among other things, that Broder was to be defendant's representative to initiate business in Latin and South America, devote his time exclusvely to defendant's business, and that he was to be paid $250 semi-monthly, plus reasonable travelling expenses. Thereafter, the parties executed another written contract of employment, dated July 24, 1944. It provided, inter alia, as follows:

"This is a written confirmation of the agreement reached between us this day, amending and modifying our former agreement of April 12, 1944 [April 27, 1944],

with respect to the retention of your services by this company as its foreign representative.

"1. You are to initiate further dealings in Latin America and South America, stimulate our present business and contacts there and purchase such merchandise required by us as we may direct and generally to perform such other duties and work as we may from time to time require in that field.

. . . . . . . .

"5. The term of this contract is the year 1944. Thereafter the contract shall continue until we have given you or you have given us thirty (30) days notice in writing of our or your intention to terminate the same. Upon the expiration of that thirty (30) day period, you will be paid compensation on actual sales at the rate herein fixed down to the date of termination, and thereupon and thereupon the contract shall cease and terminate.

*"You are to be paid as a compensation for your services a commission of six (6) per cent. on the gross volume of all merchandise sales made by this company during 1944* and thereafter until the termination of this contract, *exclusive of brokerage commission or other income, plus reasonable traveling expenses and against such commissions we will make advances to you at the rate of $500 per month.* You are not to be entitled to any other kind of compensation, reimbursement, commission or other payments from us or others without our written permission. (Italics added.)

. . . . . . . .

". . . [this contract] will constitute the entire definition of the relationship between us." (Italics added.)

The following written notice of termination, dated November 29, 1944, was sent by defendant to Broder and the latter approved it: "This will confirm agreement reached between us yesterday that our contracts covering your services as a special representative for The

Dickerson Company and/or my other interests will be terminated effective as of the end of the year 1944. This provides the 30 day notice called for in our present working arrangement and applies to any and all other agreements between us . . ." From April 27, 1944, when the relations of the parties began, until the end of that year, Broder rendered services to defendant, including a trip to South America in June, 1944, when he bought a large amount of chocolate. During this period defendant paid him regularly the sum of $500 a month in equal semi-monthly installments. Broder was killed in an airplane accident on January 8, 1945, while making a trip to South America on the business of defendant. By the introduction of this testimony, plaintiffs made out a prima facie case and the chancellor so concluded.

Defendant admitted the execution of the contracts of April 27 and July 24, 1944, as well as the termination notice of November 29, 1944, and also that he paid Broder the sum of $500 a month from April 27 to December 31, 1944. However, over the objection of counsel for plaintiffs, defendant was permitted to present parol testimony to show that the written contract of July 24, 1944, and the termination notice of November 29, 1944, were actually not executed until December 31, 1944; and that at that time there was an oral contemporaneous agreement entered into by defendant and Broder providing that the latter was actually to receive as compensation only the sum of $500 a month, as set forth in the contract of April 27, 1944, and that the "commission of six (6) per cent, on the gross volume of all merchandise sales made by this [defendant] company during 1944", as set forth in the contract of July 24, 1944, was not to be paid to Broder as compensation as this latter contract expressly provided, but instead was intended to create a sufficient fund with which to make an advancement to Broder in order that he could repay his own debt of $10,000 to one Benjamin H. Freedman. Defendant's

witnesses also were permitted to testify that it was further orally agreed at that time that such advancement was to be made only upon the following conditions: (a) that Broder successfully carry out and complete the objectives of the trip to South America on which he was to embark in January 1945 on defendant's behalf; and (b) that the amount of such advancement could be deducted as a business expense on defendant's 1944 income tax return. Furthermore, defendant was permitted to show by oral testimony that on December 31, 1944, the parties also executed a contract postdated January 2, 1945. This instrument provided, inter alia, as follows:

"1. We have agreed that you undertake a trip to South America on my behalf of the purposes set forth in our former written agreements of April 12, 1944 [April 27, 1944] and July 24, 1944.

"2. You will leave this week or as soon thereafter as possible.

"3. Your compensation shall be reasonable travelling expenses plus such percentage of profits resulting from your trip as I may later fix.

⋯ ⋯ ⋯ ⋯ ⋯ ⋯ ⋯ ⋯

"6. On demand, you will repay to me all compensation and expenses or other payments of whatsoever kind or character heretofore or hereafter paid to you by me." The defense contended that Broder was paid his full compensation of $500 per month under the contract of April 27, 1944, and that his death in the airplane crash had made it impossible for him successfully to carry out or complete the objectives of his trip, and consequently there was no liability on the part of defendant under the contract of July 24, 1944.

As to the set-off and counterclaim, defendant presented testimony to show that immediately prior to Broder's departure for South America in June, 1944, he was directed by defendant to take out a travel acci-

dent insurance policy in the sum of $25,000, with The Dickerson Company as the named beneficiary, and to charge the premium therefor to that company. This Broder agreed to do, and in his expense account, dated June 2, 1944, which he submitted to The Dickerson Company, he credited himself with an item of $35 for "travel insurance" against expense moneys advanced to him. This represented a one-year premium on a $25,000 policy, and The Dickerson Company credited him with that amount. Defendant adduced further testimony to show that he reminded Broder on December 31, 1944, that he wished Broder to continue the policy and that Broder informed him that it remained in full force and effect. Broder did in fact take out such a policy on May 31, 1944, but he named his wife as beneficiary, and following his death the proceeds thereof were paid to her. Also, defendant offered evidence to the effect that shortly before Broder's departure for South America in January, 1945, he, defendant, delivered to Broder the sum of $1,600 to cover his travelling expenses, and that following the death of Broder, his executors failed and refused to account for and return to defendant this money or any unexpended part thereof.

Relying upon defendant's testimony as to the parol contemporaneous agreement of December 31, 1944, the learned chancellor dismissed the bill; and, after hearing but part of the testimony as to the set-off and counterclaim of defendant, he ruled that matter out of the equity proceeding and transferred it to the law side of the court.

It is my opinion that it was error to hold that this parol evidence is admissible, since clearly it varies and contradicts the written instrument of July 24, 1944. No fraud, accident or mistake relating to the execution of that writing was alleged or proved. Without a doubt, this case is ruled by *Gianni v. Russell & Co., Inc.,* supra. There we said (pp. 323-324) : " 'Where parties, without

any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement': Martin v. Berens, 67 Pa. 459, 463; Irvin v. Irvin, 142 Pa. 271, 287. 'All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence': Union Storage Co. v. Speck, 194 Pa. 126, 133; Vito v. Birkel, 209 Pa. 206, 208. *The writing must be the entire contract between the parties if parol evidence is to be excluded and to determine whether it is or not the writing will be looked at and if it appears to be a contract complete within itself 'couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing'*: Seitz v. Brewers' Refrigerating Machine Co., 141 U.S. 510, 517. When does the oral agreement come within the field embraced by the written one? This can be answered by comparing the two, and determining whether parties, situated as were the ones to the contract, would naturally and normally include the one in the other if it were made. If they relate to the same subject-matter and are so inter-related that both would be executed at the same time, and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing. This question must be determined by the court." (Italics added.)

The majority opinion states: "Had the paper of July 24, 1944 been unconditionally executed and delivered and intended to be a true contract between the parties then, under *Gianni v. R. Russell & Co., Inc.*, 281

Pa. 320, 126 A. 791, and the numerous cases following it, defendants could not be heard to contradict or alter its written terms. *But the paper was not in fact so unconditionally executed and delivered.* It was specifically agreed that the terms of the agreement, and the entire scheme, was *subject to the approval of one Robert Ash, Esquire, a tax attorney in Washington, D. C."* The majority in the first instance erroneously presupposes that the oral testimony in question is admissible, and then apparently reasons that since that testimony is in sharp conflict with the provisions of the written instrument, that then the oral testimony should be admitted. In other words, it pulls itself up by its own bootstraps—it commences its reasoning with the conclusion as its premise. In order to reach the proper conclusion as to whether or not parol evidence is admissible, we must, as set forth in *Gianni v. Russell & Co., Inc.,* supra, first examine the the written instrument by itself, and "if it appears to be a contract complete within itself 'couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement' ", then we must hold such oral testimony to be inadmissible.

An examination of the writing here in question, unequivocally shows that it is complete in itself—in fact, the intent of the parties to make it exclusive is made perfectly clear by their own language, i.e. "[this contract] will constitute the entire definition of the relationship between us." It is "couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement." This instrument states that it amends and modifies the former agreement of the parties, and sets forth in clear and concise language the compensation Broder is to be *paid* and the basis upon which that compensation is to be computed. It further gives the duration, the length of the period of notice of termination, and other details.

When the oral evidence is compared with this written contract, it is obvious that the written instrument embraces the very field of the oral agreement. The writing specifically provides that Broder is to be *paid as compensation for his services* "a commission of six (6) per cent, on the gross volume of all merchandise sales made by this [defendant] company during 1944." The parol evidence materially varies this provision in that it changes Broder's *pay* to $500 a month and provides for a loan to him of $10,000, and then completely destroys the written provision by subjecting the making of that loan to the condition that defendant can unlawfully deduct the amount thereof from his income tax as an operating expense with the approval of his tax attorney.

It is stated in Henry, Pennsylvania Trial Evidence (Third Ed.), §361, pp. 534-5: "More recent decisions disclose a gradual departure from the liberality of the . . . [earlier] cases in admitting parol evidence to show an inducement for the signing of a written agreement, and indicate that the courts 'are not disposed to widen the rule as to the admissibility of such testimony, but rather to narrow it and to hold persons to their contracts as they write them.' Finally the supreme court changed the prior rule by limiting its application to cases where the subject matter of the oral contract is not mentioned or included in the writing and holding that in cases where the subject matter of the oral contract is covered or in any manner dealt with in the writing, a breach of faith or failure to perform an agreement which induced the execution of the writing is not such a fraud as will justify the court in setting it aside", citing *Gianni v. Russell & Co., Inc.*, supra, and *First National Bank of Hooversville v. Sagerson*, 283 Pa. 406, 129 A. 333.

*Eaton v. N. Y. Life Ins. Co. of N. Y.*, 315 Pa. 68, 172 A. 121, does not rule this case, as the majority holds. That case was never intended to widen the rule as laid down by us in *Gianni v. Russell & Co., Inc.*, supra. This

is shown conclusively by the fact that the *Gianni* case was cited by this Court with approval in *Philadelphia v. Nat. Surety Co.,* 315 Pa. 356, 360, a month after the *Eaton* case was decided and numerous times since. In the *Eaton* case parol evidence was held to be admissible primarily to prove the non-payment of the premium on a life insurance policy, which expressly acknowledged receipt thereof. It has long been the law of this Commonwealth that parol evidence is admissible to prove failure of the consideration mentioned in a written instrument: *Cridge's Estate,* 289 Pa. 331, 337, 137 A. 455; *Early v. Huntley,* 315 Pa. 382, 384, 172 A. 683. However, that is not the situation in the instant controversy. Here, defendant relies entirely for his defense on an alleged oral understanding concerning compensation to be paid to Broder which is expressly dealt with in and fixed by the written instrument. He seeks by parol testimony to add to that unconditional and complete legal writing certain provisions and conditions which destroy the entire instrument.

*Bk. of Hooversville v. Sagerson,* supra, is particularly apropos to the present situation. There, this Court held that one who signs a promissory note to mislead a bank examiner cannot set up as a defense that it was orally agreed, at the time he signed, that he should not in any way be liable on the note, where he does not show that his signature was the result of some legal fraud, accident or mistake. There, we said (pp. 411-2) : "Concerning the defense that the maker of a note upon which suit is brought signed it with the understanding that it was a mere matter of form and not an obligation, we said in Ziegler v. McFarland, 147 Pa. 607, 609-10: 'It is sufficient to say that it is a flat contradiction of the terms of a plain business writing, which any one competent to do business at all could not fail to understand. No accident is alleged, and the only fraud or mistake is the representation that it was "not an obligation," though

its express terms had that and no other meaning. If the rule as to parol evidence to vary writings is to have any application at all it should be to such cases as this: Clarke v. Allen, 132 Pa. 40.' " See also *Baer's Appeal*, 127 Pa. 360, 18 A. 1; *Intern'l Fuel Serv. Corp. v. Stearns*, 304 Pa. 157, 155 A. 285; *Richards v. Intergrity Trust Co.*, 317 Pa. 513, 177 A. 28; *Arrighi v. Renwick*, 326 Pa. 508, 192 A. 655. Furthermore, this Court said in *Speier v. Michelson*, 303 Pa. 66, 72, 154 A. 127: "Any parol agreement that subjects the obligation on the instrument to any condition or contingency, whether in person, time or amount, is ineffective, and the instrument is unconditional, unless fraud, accident, or mistake was the means through which the instrument was procured."

For these reasons, I am convinced that the learned chancellor was in error in admitting evidence as to the alleged oral agreement, and therefore his findings, conclusions and decree based thereon should be set aside. Plaintiffs, having made out a prima facie case on competent evidence which was not contradicted by any legal evidence offered by defendant, are entitled in my opinion to an accounting for compensation due their decedent under the written contract of April 27, 1944, as amended and modified by the contract of July 24, 1944.

A casual inspection of the terms of the alleged contract of January 2, 1945, reveals that it is a *nudum pactum*, and, therefore, of no legal effect.

Since plaintiffs clearly are entitled to an accounting, I am satisfied that substantial justice requires that the entire controversy, including the set-off and counterclaim, be disposed of in this equity proceeding, and for that reason the set-off and counterclaim should be transferred back to the equity side of the court.

Under the circumstances here presented, I would reverse the decree and remand the record to the court below for further proceedings consistent with the views I have herein set forth.