# First National Bank of Hooversville, Appellant, *v.* Sagerson et al.

# Farmers Trust and Mortgage Co. to use, Appellant, *v.* Sagerson et al.

*Promissory notes—Judgment note—Denial of liability—Fraud, accident or mistake—Contract—Evidence—Deception of bank examiner—Intent to deceive — Banks and banking — Authority of president of bank.*

1. One who signs a promissory note cannot set up as a defense that it was agreed, at the time he signed, that he should not in any way be liable on the note, where he does not show that his signature was the result of some legal fraud, accident or mistake.

2. A breach of faith or of an agreement regarding the doing or refraining from doing something in the future, is not fraud, as that word is employed in the phrase "fraud, accident or mistake."

3. The maker of a promissory note cannot set up as a defense that it was agreed that he should not be liable on the note and that the transaction was merely temporary and intended to deceive the bank examiner.

4. In such case, the fact that there was no actual deception of the bank examiner is immaterial, inasmuch as it is not the completed act, but the intent to deceive that precludes the defense in question.

5. A president of a bank has no authority without the permission of the directors to surrender the assets of the bank under a parol agreement that persons placing their names on promissory notes given to the bank shall not be liable.

6. An accommodation party to a promissory note is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be an accommodation party.

7. A maker of a note given to a bank cannot assert that such note was made for the accommodation of the bank, where it appears that it was in fact made for accommodation of the co-makers of the note in securing an interest in a theatre which the bank did not own, but was merely operating.

8. In such case even if the bank owned the theatre it would be immaterial as affecting defendant's liability.

Argued March 25, 1925. Appeal, Nos. 69 and 70, March T., 1925, by plaintiff, from judgments of C. P. Cambria Co., March T., 1917, Nos. 121 and 122, on verdicts for defendants, in case of First National Bank of Hooversville v. John L. Sagerson and Victor A. Rigaumont, and The Farmers Trust and Mortgage Co., to use of The United States Trust Company of Johnstown, v. John L. Sagerson and Victor A. Rigaumont. Before FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Issues to determine validity of judgments. Before REED, P. J. of O. C., specially presiding.

The opinion of the Supreme Court states the facts.

Verdicts and judgments for defendants. Plaintiffs appealed.

*Errors assigned* were, inter alia, orders opening judgments, and various rulings and instructions at the trial, quoting record.

*John C. Davies,* with him *Tillman K. Saylor* and *Joseph Levy,* for appellants.—The evidence was not sufficient to relieve defendant from his express liability: Thompson v. Schoch, 254 Pa. 585; Spencer v. Colt, 89 Pa. 314; Ogden v. Traction Co., 202 Pa. 480; Highlands v. R. R., 209 Pa. 286; Reno v. Moss, 120 Pa. 49.

A bank president has no authority to agree that the maker of a note for a consideration shall not be liable thereon: First Nat. Bank of Greencastle v. Baer, 277 Pa. 184; Shields v. Hitchman, 251 Pa. 455; Thompson v. Schoch, 254 Pa. 585, 595; Superior National Bank v. Stadelman, 153 Pa. 634; Bangor, etc., Ry. Co. v. Slate Co., 203 Pa. 6.

*George E. Wolfe,* with him *A. Lloyd Adams,* for appellees.—The petition having averred that fraud was practiced in procuring the execution of the notes, and in

their use, the evidence was sufficient to move the conscience of the chancellor to open the judgments: Peale v. Addicks, 174 Pa. 543; Tasker's Est., 182 Pa. 122; Lackawanna Trust Co. v. Carlucci, 264 Pa. 226.

The matter of making absolute the rule to open the judgment was in the discretion of the court below: Powell v. Smith, 279 Pa. 538; Tressler v. Emerick, 278 Pa. 128.

Defendant, John L. Sagerson, was not a party to an illegal transaction.

OPINION BY MR. JUSTICE SCHAFFER, May 11, 1925:

Defendants executed two judgment notes in favor of the plaintiff banks amounting together to the sum of $10,000. They were dated December 21, 1916, and judgments were entered thereon the next day. In March following, Sagerson presented a petition to open the judgments so far as he was concerned and to permit him to make a defense thereto. The prayer of the petition was granted and a jury trial awarded (the two cases being tried together) which resulted in verdicts in Sagerson's favor; judgments were entered and from them plaintiffs prosecute these appeals.

The cases present this situation: Appellee, an intelligent man, a physician and surgeon, who with another executed judgment notes in which he obligated himself to pay the sums named therein to two banks, alleges that, notwithstanding his promise to pay, it was agreed by the president of the banks that he was not to be liable. Appellee admits he knew the legal effect of signing the notes. The court below permitted him to escape liability. If the integrity of written instruments is to be upheld, and we have announced it as our policy to uphold them (Gianni v. Russell & Co., Inc., 281 Pa. 320, 325), appellee must show the presence of some legal fraud, accident or mistake before the defense he seeks to make is available. This we think he failed to do.

The two plaintiff banks owned notes of the Garden Theatre Company representing an indebtedness of about $13,000 and as collateral therefor held a bill of sale of the personal property in the theatre, an assignment of the lease of the theatre building which had several years to run, and an assignment of capital stock of the theatre company at least sufficient in amount to insure control. Rigaumont, joint maker of the notes in question with appellee, and one Wild; sometime prior to the execution of the notes, entered into negotiations with officials of the banks to secure control of the theatre company. They were not able to finance the matter in a way satisfactory to the banks and suggested that they would procure the aid of Dr. Sagerson to help along the scheme. The banks on investigation found that Sagerson was financially responsible and on the afternoon of December 21, 1916, he, with Wild and Rigaumont, called by prearrangement at the office of the trust company plaintiff, and there met P. J. Blough, who was president of both institutions, and his son, E. M. Blough, who was treasurer of the trust company. Both of these men were strangers to Sagerson. Some conversation took place, just what it is difficult to say with a sense of certainty, as the Bloughs and the three others differed radically as to its import. But as to some important and well nigh controlling circumstances there is and can be no doubt, as they speak for themselves.

These are the circumstances: Sagerson and Rigaumont then and there executed the two judgment notes in question, one to the trust company for $6,349.64 and the other to the bank for $3,650.36. The Bloughs thereupon handed over the four judgment notes which the two banks held against the theatre company, amounting with interest due thereon to more than $13,000, assigned to Sagerson and Rigaumont without recourse, and also assigned and handed over to them the bill of sale of the personal property in the theatre, the lease thereof and the stock of the theatre company which had been held

as collateral for the four notes. These papers went into the possession of Rigaumont, apparently, because Dr. Sagerson had to leave after he executed the notes to fulfill a professional engagement. The situation then was that the banks had given up everything which they held against the theatre company and received in lieu thereof the two judgment notes signed by Sagerson and Rigaumont. Notwithstanding this situation, it is Sagerson's contention and he so testified that he was not to be held liable on the notes.

We will let his own language from the witness stand on the trial, eliminating some repetitions, tell why he regarded himself as not bound by the obligations he signed. In answer to the question as to what Blough said to him which induced him to sign the notes, Sagerson replied "I told him if I put my name to these notes I would be rendering myself liable, and he said 'No, this is only a temporary arrangement'; that the reason he wanted my name was because the bank examiner might object to Mr. Wild's name being on the paper; that they had so much of his paper there now, and it was only a temporary arrangement; then I said 'If I sign these notes, it is with the distinct understanding that I am not incurring any liability in any manner, shape or form; I am not buying, selling or bargaining; I am not interested in this; it is the bank's business not mine.' Mr. Blough said he understood that, and then I signed those notes and Mr. Rigaumont signed them. Mr. Wild said 'Remember Mr. Blough, Dr. Sagerson is not incurring any liability, that these notes are not to be entered, that Dr. Sagerson is not to be annoyed.' Mr. Blough said that he understood." Sagerson further testified that Blough told him his signing the notes was a mere matter of form. The Bloughs denied that any such conversation took place; Rigaumont and Wild in the main corroborated Sagerson. We have assumed, as we should because of the verdict in his favor, that the conversation was exactly as Dr. Sagerson related it. A careful reading of his

testimony shows that he would seem to have signed the notes without expecting to buy or get anything in return, without knowing what his acquaintances Wild and Rigaumont were getting, indeed whether they were getting anything, and without having any interest whatsoever in the transaction regarding the theatre. According to his own testimony, taken in its fullest possible strength, the only thing in his mind at the time of signing the notes was, not that he would become liable only upon the happening of a certain event but that he would never be liable and his signature on the notes had as its only reason for being there the statement by Blough that Wild was on a lot of paper and the bank examiner might object to his being on any more.

The testimony of Sagerson and all the evidence in his behalf can have no other possible effect than to nullify the written instruments which he signed or to show that he was a party to a plan to deceive the bank examiner. Recent decisions of this court dispose readily of both these aspects of appellee's testimony. If its purpose was to show that the writing was a mere nullity, it was altogether inadmissible on the authority of Evans v. Edelstein, 276 Pa. 516, and Second National Bank of Reading v. Yeager, 268 Pa. 167; if appellee relies for his defense on the scheme to mislead the bank examiner, he is precluded by the flat decision in First National Bank of Greencastle v. Baer, 277 Pa. 184. Appellee seeks to take himself out of the rule forbidding evidence of a verbal agreement by alleging fraud. The promise not to use the judgment note, and the subsequent entry of it, do not constitute fraud within the legal meaning of that word. Despite what was said in early Pennsylvania cases, it has been stated, and we now repeat, that a breach of faith or of an agreement regarding the doing or refraining from doing something in the future is not fraud, as that word is employed in the phrase, "fraud, accident or mistake." Concerning the defense that the maker of a note upon which suit is brought signed it

with the understanding that it was a mere matter of form and not an obligation, we said in Ziegler v. McFarland, 147 Pa. 607, 609-10: "It is sufficient to say that it is a flat contradiction of the terms of a plain business writing, which any one competent to do business at all could not fail to understand. No accident is alleged, and the only fraud or mistake is the representation that it was 'not an obligation,' though its express terms had that and no other meaning. If the rule as to parol evidence to vary writings is to have any application at all it should be to such cases as this: Clarke v. Allen, 132 Pa. 40."

We do not agree with the court below that the case of First National Bank of Greencastle v. Baer, 277 Pa. 184, is to be distinguished from the one in hand because here there was no actual deception of the bank examiner as there was in the compared case. It is not the completed act, but the intent, that precludes the defense when any person signs instruments and gives them to a bank for the sole purpose of deceiving examiners. The transaction is unlawful before any actual deception takes place.

As before stated, for sometime prior to December 21, 1916, Wild and Rigaumont had negotiations with P. J. Blough for the sale to them of the interest held by the banks in the theatre company. Wild and Rigaumont likewise had disclosed their plan of purchasing the theatre to Sagerson, asserting that the controlling interest in the theatre could be purchased at an advantageous price and that they had immediate prospects of selling it at a profit or that they might be able to secure some substantial aid from a New York concern and operate it at a profit; Sagerson admitted his knowledge of this. It is clear that appellee signed and delivered the notes to the bank for the purpose of enabling Wild and Rigaumont to purchase the controlling interest in the theatre company. In answer to the inquiry as to when the notes were to be returned to him, he answered "The notes

weren't to be returned to me at all that I know of."
When the notes were signed, Sagerson was the only
financially responsible party. Wild's affairs were in the
hands of a receiver and Rigaumont shortly thereafter
went into bankruptcy. The evident expectation was that
the theatre would be sold at a profit before the maturity
of the notes and that consequently there would be no
ultimate liability on the part of Sagerson. He admitted
on cross-examination that he knew the ordinary legal
effect of putting his name to a note and that if he signed
he would be responsible for it, ordinarily. He also knew
that following his signing of the notes, Wild and Rigau-
mont took over the theatre; subsequently he endorsed
another note for them for $500 to enable them to pay the
rent due upon it. He admits that Wild agreed to pay
back to him this note in case he, Sagerson, had to pay it
and that his signing this note was a personal accommo-
dation to Wild. Blough had nothing to do with the sign-
ing of this obligation, although one of his banks dis-
counted it. Sagerson has refused to pay it.

The admission in the answer of the averment in the
petition as to the authority of Blough can have no such
import as the court below gave to it, that Blough had
authority from the banks to deliver up valid obligations
for ones which he had agreed were invalid. All that the
admission amounts to is that Blough had authority to
act for the banks in the transaction of the negotiation of
the two notes in question and the surrendering of the
four notes and the accompanying collateral to Sagerson
and Rigaumont. There was no averment, much less ad-
mission, that the boards of directors of the banks had
knowledge of Blough's act or that they ratified them.
The averment in the petition which was admitted was as
follows: "That on December 21, 1916, P. J. Blough was
president and a director of [the bank or trust company],
a corporation [duly organized], plaintiff above named,
and was authorized and empowered by its board of direc-
tors to act for it and in its business transactions and

particularly in the transaction herein set forth." The president of a bank has no power to bind the bank by a parol agreement that persons placing their names on paper given to the bank shall not be liable: First National Bank of Greencastle v. Baer, 277 Pa. 184; 1 A. L. R. 703-4.

Sagerson averred, as did Wild and Rigaumont, that he signed the notes as an accommodation to the bank. While they said this, manifestly they either did not understand what was meant by the word "accommodation" in the sense in which they used it or they perverted the fact. When the defendant signed the notes in question, he knew that the sole purpose of the obligations was to aid his co-maker and Wild in securing from the banks their interest in the theatre and to enable Rigaumont and Wild to secure a controlling interest in it and to operate it themselves or sell it at a profit. Obviously, this was not for the benefit of the banks. As a sample of what Rigaumont understood by the word "accommodation" a quotation from his evidence will show. Speaking of what took place when Sagerson signed the notes, he said "Well, he said he would put his name on those notes, but it was with the distinct understanding that it was a matter of accommodation until George Wild would secure sufficient moneys in order to be able to put his name on the notes." In answer to the question "As a matter of accommodation to whom," he answered "To the banks." It is obvious that the accommodation was for Wild and that what was meant was that Sagerson was signing the notes as a temporary maker thereof until Wild was in position to sign them and for the protection, not the accommodation, of the banks. Wild, however, testified that the arrangement with Sagerson was purely an accommodation to him to enable him to purchase the controlling interest in the theatre company. It being clear therefore that Wild and not the bank was the accommodated party (which makes the rule of Lackawanna Trust Co. v. Carlucci, 264 Pa. 226, inapplicable) and that

the bank gave value for the instrument, Sagerson even as accommodation maker is clearly liable, though he did not personally receive anything: First National Bank of Greencastle v. Baer, 277 Pa. 184; Schimmel v. Cohen, 275 Pa. 117; Buhler Co. v. Chidester, 262 Pa. 130. "An accommodation party is one who signed the instrument as maker, drawer, acceptor, or endorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be an accommodation party": Act of May 16, 1901, P. L. 194, 199, sec. 29.

There are some other matters in connection with Sagerson's defense to which it may be well to allude. His counsel argued at bar that the bank was the owner of the theatre and, that being so, the situation was different from what it would be if it had no interest save in the notes which it held; that Blough in selling the theatre to Wild and Rigaumont had such an interest as to make the obtaining of Sagerson's signature to the notes a fraud on him. Reflection has convinced us that whether the bank owned the theatre or only the notes makes no difference so far as the application of legal principles is concerned, but the fact is that the bank did not own the theatre. Its only interest was in the notes it held. The circumstances upon which appellee bases his argument that the bank owned the theatre are that in his deposition P. J. Blough spoke of "our interest in the Garden Theatre Company" and because one of the officers of the trust company had been conducting the business for the theatre company, receiving the income from the theatre which he deposited in the trust company to the credit, not of the trust company, but of the theatre company, and out of it paying the bills of the theatre company. This official also kept the books of the theatre company. No implication of ownership of the theatre company arises from this situation and it is obvious that

when Blough spoke of "our interest" he was referring to the indebtedness of the theatre company on the notes.

The court erred in the first instance in opening the judgments and thereafter in submitting the cases to the jury.

The verdicts of the jury and the judgments thereon are set aside and the original judgments are reinstated.