MELLON BANK CORPORATION and
Mellon Bank, N.A., Appellants in
No. 90–3712,

v.

FIRST UNION REAL ESTATE EQUITY
AND MORTGAGE INVESTMENTS,
Appellants in No. 90–3790.

Nos. 90–3712, 90–3790.

United States Court of Appeals,
Third Circuit.

Argued Nov. 14, 1991.

Decided Dec. 19, 1991.

**1400**

Paul A. Manion (argued), Martha J. Greer, Manion McDonough & Lucas, Pittsburgh, Pa., for Mellon Bank Corp. and Mellon Bank, N.A.

Kenneth S. Mroz, Dickie, McCamey & Chilcote, Pittsburgh, Pa., James T. Crowley (argued), Virginia S. Brown, Thompson, Hine & Flory, Cleveland, Ohio, for First Union Real Estate Equity and Mortg. Investments.

Before HUTCHINSON and COWEN, Circuit Judges, and O'NEILL, District Judge [*].

---

* Hon. Thomas N. O'Neill, Jr., District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

### I.

These consolidated appeals arise out of a diversity action, controlled by Pennsylvania law, that was removed from the Court of Common Pleas of Allegheny County, Pennsylvania, to the United States District Court for the Western District of Pennsylvania. At Docket No. 90–3712, Mellon Bank Corporation (Mellon) appeals from a final order of the district court granting summary judgment to First Union Real Estate Equity and Mortgage Investments (First Union), a real estate investment trust (REIT), on Mellon's claims for breach of contract and fraudulent misrepresentation. By those claims, Mellon sought to enforce oral promises it said First Union made in connection with two formally separate but functionally related transactions evidenced by written agreements between Mellon and First Union. In one transaction, Mellon agreed to lease an office building from First Union with an option for Mellon to purchase the property on an installment sale basis. In the other, Mellon agreed to loan First Union an amount that approached the purchase price for the office building. The lease-purchase agreement for the office building expressly denied Mellon any right to prepay First Union, but the loan agreement gave First Union the right to prepay Mellon's loans to it. First Union prepaid Mellon's loans to it on September 19, 1983.

On February 22, 1988, Mellon filed this action for breach of contract alleging an oral side agreement by which First Union promised either not to prepay Mellon's loans or, if it did prepay, to otherwise protect Mellon against the market risk of a decline in interest rates. Alternately, Mellon sought to recover from First Union on a theory of fraudulent misrepresentation of First Union's intent not to prepay or to protect Mellon in the event it did prepay. First Union moved for summary judgment in October, 1989. The district court granted the motion in September, 1990. It held that Pennsylvania's version of the parol

evidence rule barred introduction of First Union's alleged oral promises, that the so-called "fraud exception" to the parol evidence rule did not apply, and that Mellon's claim for fraudulent misrepresentation failed because it had not produced clear and convincing evidence that First Union had falsely misrepresented its present intention with respect to prepayment, or to protect Mellon, and that Mellon could not have reasonably relied on First Union's oral promises not to prepay without protecting Mellon against a decline in interest rates. *See Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs.*, 750 F.Supp. 711 (W.D.Pa.1990).

On October 8, 1990, after the district court entered judgment in its favor, First Union moved for Rule 11 sanctions against Mellon claiming there was no "good ground to support" Mellon's claims. *See* Fed.R.Civ.P. 11. This motion was made nearly two and one-half years after this suit was removed to federal court. At Docket No. 90–3790, First Union cross-appeals the district court's order denying its motion for Rule 11 sanctions. In that connection, Mellon now seeks double costs and damages from First Union under Federal Rule of Appellate Procedure 38 for pursuing what Mellon says is a frivolous appeal from the denial of Rule 11 sanctions.

For the reasons explained below, we will affirm the order of the district court granting summary judgment in First Union's favor. We will also affirm the district court's order denying First Union's motion for sanctions against Mellon under Federal Rule of Civil Procedure 11. Finally, we will deny Mellon's Rule 38 request for double costs and damages against First Union on account of First Union's appeal from the district court's denial of the Rule 11 motion.

### II.

In 1981, Mellon, in need of more office space, approached First Union to see whether it was interested in selling the One Oliver Plaza building. First Union's management, faced with the prospect of a

hostile takeover bid, needed cash. The basic ingredients for a mutually beneficial deal seemed present.

As often happens, in the negotiations that ensued it became clear the parties had conflicting interests. These conflicts made it hard to reach a meeting of the minds. Mellon wanted to pay cash to purchase the building because it could generate funds internally at rates below the market. First Union would not accept an all-cash transaction because of severely adverse tax consequences to its investors. First Union's status as a real estate investment trust required it to distribute to its beneficiaries 95 percent of its earnings from the transaction in one year. *See generally* 26 U.S.C.A. § 4981(b) (West 1989) (capital distribution requirement of real estate investment trusts). Thus, it needed to structure the deal as a tax-free exchange or as an installment sale that would spread its income from the transaction over a number of years.

On January 25, 1982, the parties reached an agreement in principle. Under it Mellon would lease One Oliver Plaza from First Union with an option to purchase. If the option was exercised, payment of the purchase price would be in deferred installments in order to meet First Union's need to spread its gain on the sale over the term of the lease-purchase agreement. The agreement was structured so that Mellon would pay for the building in a combination of cash, the assumption of the underlying building mortgages and the execution of a $48 million note and purchase money mortgage. It also gave Mellon the right to assign its option to purchase if it guaranteed the mortgage debt of its assignee. The agreement denied Mellon the right to prepay the $48 million dollar debt the mortgages secured.[1] The note that was to evidence this debt stated:

> The undersigned shall not have any right or privilege to prepay all or any portion of the written obligations prior to the maturity date.

Joint Appendix (Jt.App.) at 451.

In order to meet its need for immediate cash to counter a hostile takeover bid, First Union asked Mellon to loan it $46 million secured by mortgages on two shopping malls First Union owned (the "mall loans"). The $46 million loan was to be evidenced by documents formally unconnected with the lease-purchase agreement for One Oliver Plaza. In contrast to Mellon's obligation to First Union under the One Oliver Plaza agreement, Mellon's loan to First Union *did* permit First Union to prepay the debt. The two notes evidencing First Union's obligations under the mall loans stated:

> Upon giving the holder hereof at least ten (10) days prior written notice, the Maker [First Union] reserves the right to prepay the unpaid principal balance of this Note, in whole or in part.

Jt.App. at 435, 441.

The parties do not dispute that the One Oliver Plaza transaction and Mellon's mall loans to First Union were formally drafted as separate transactions. While First Union says that the two transactions were entirely separate funding options explored by First Union's president, Donald Schofield, to counter a hostile takeover bid, Mellon characterizes the two as "matched" or "back-to-back" transactions. Mellon says that it agreed to make the mall loans to First Union only if they were matched with the mortgage from First Union to Mellon to finance Mellon's contemplated purchase of One Oliver Plaza, both loans having identical interest rates of 14 percent. Thus, Mellon contends the matched interest rates of the two transactions reflect Mellon's intent to avoid the risk of declining interest rates that would otherwise result from its agreement to assume the $48 million mortgage on One Oliver Plaza. Mellon says that it had insisted on a prepayment prohibition in the mall loans to preserve their matched nature with the One Oliver Plaza mortgage, but that Schofield refused, because he wanted to avoid any appearance that the two transactions

---

1. First Union insisted on this prepayment prohibition based on tax advice it had received that prepayment ability could frustrate the install-ment sale treatment First Union needed for tax purposes. *See generally* 26 U.S.C.A. § 453 (West Supp.1991) (tax treatment of installment sales).

were tied together.[2]

Mellon produced evidence to show that before the deal was finalized Schofield made an oral promise to two high-level Mellon officials that he would not prepay. One says Schofield said he had "no incentive to prepay" but promised: "If I prepay the mortgages on the shopping centers I will do something or allow you to prepay [the One Oliver Plaza note]. I won't do anything to harm you or to hurt you." *Id.* at 185. "[W]e'll index them to some number on your cost of funds so that you won't be hurt." *Id.* at 190. The other says Schofield said "he might want to prepay because he might sell a mall, et cetera," *id.* at 271, but promised "[t]hat if he did prepay, that he would provide [Mellon] with the same security and the same payment terms on another instrument." *Id.* at 272. First Union denies that these promises were made. One of Mellon's attorneys testified on deposition that these oral promises explain why the loan documents do not contain the usual boilerplate integration that the full agreement of the parties is represented in the written contract.

Although the mall loans had been approved by Mellon's real estate department in mid-February, the purchase of One Oliver Plaza required approval of Mellon's board of directors. The board members were not apprised of First Union's alleged oral promises. The lease-purchase agreement and the mall loans closed on March 10, 1982. Before Mellon's right to exercise

its option to purchase expired, another building became available. Mellon then decided not to purchase the One Oliver Plaza building itself, but instead assigned its option to purchase to a limited partnership known as One Oliver Plaza Associates (Associates) in February 1983. Thus, Associates instead of Mellon executed the One Oliver Plaza mortgage note on May 13, 1983. Mellon, however, guaranteed payment of Associates' $48 million note to First Union in the event that Associates defaulted.[3]

In February of 1983, First Union had already filed a shelf registration with the Securities Exchange Commission (SEC) for a public offering of securities in the amount of $50 million. It intended to use the proceeds to prepay the two mall loans. In late August of 1983, First Union notified Mellon that it intended to prepay the mall loans. First Union prepaid the mall loans on September 19, 1983. First Union did not offer Mellon any other security following its prepayment. By 1986, interest rates had fallen far below the rate Mellon had guaranteed on the $48 million mortgage from First Union. First Union denied Mellon's request to refinance the One Oliver Plaza mortgage. With its estimated loss of over $10 million, Mellon initiated this action.

### III.

▮▮▮ We have jurisdiction over the final orders of the district court granting

**2.** According to Mellon, Schofield insisted on the appearance of independence to lessen the likelihood of Internal Revenue Service scrutiny, *i.e.,* if the two transactions mirrored each other they might be considered a single transaction and the One Oliver Plaza transaction could then lose its installment sale status.

**3.** Mellon and Associates also entered into a loan agreement on this date. It provided that Mellon would advance funds for the payment of principal and interest on the $48 million note to First Union. In connection with this agreement, Mellon and Associates executed an advance money mortgage and security agreement, together with a third mortgage note, in the principal sum of $93,143,632.00.

First Union raises the argument that Mellon lacked standing to bring the present action since Associates signed the One Oliver Plaza note and

Mellon is merely the note's guarantor. We reject this argument. While Mellon has funded and separately guaranteed the payment of principal and interest on the $48 million note at its 14 percent, it receives from Associates payments of interest on the loan at a rate of only 8.2 percent. Even though the note is not yet in default, Mellon introduced evidence that it has suffered $10 million in damages as a result of First Union's prepayment and resulting destruction of the matched nature of the two related transactions. Mellon says it has been deprived of the 14 percent rate of interest which had been payable by First Union on the two mall loans, while at the same time, by advancing funds for Associates, it has been required to pay that rate of interest to First Union on the One Oliver Plaza loan. We hold that Mellon has a substantial interest in the outcome of this case, based on its relationship with Associates, that gives it standing to bring this action.

First Union's motion for summary judgment and denying its motion for Rule 11 sanctions pursuant to 28 U.S.C.A. § 1291 (West Supp.1991). The district court had subject matter jurisdiction under the removal statute, 28 U.S.C.A. § 1441(a) (West 1973),[4] based on diversity of citizenship pursuant to 28 U.S.C.A. § 1332(a) (West Supp.1991).

We exercise plenary review over the district court's grant of summary judgment in favor of First Union. *See International Union, UMWA v. Racho Trucking Co.,* 897 F.2d 1248, 1252 (3d Cir.1990). In conducting this review, we address the record and issues in the same manner as the district court ruling on such a motion. *Wood v. R.R. Donnelley & Sons Co.,* 888 F.2d 313, 314 (3d Cir.1989). Accordingly, all facts in the record, and all reasonable inferences deduced therefrom, will be construed in the light most favorable to Mellon, the nonmoving party. *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990).

In reviewing the district court's Rule 11 determination, we apply an "abuse-of-discretion standard." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990); *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 289 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). We employ an objective test in deciding whether an appeal is frivolous under Federal Rule of Appellate Procedure 38. *See Hilmon Co. (V.I.) v. Hyatt Int'l.,* 899 F.2d 250, 253 (3d Cir.1990).

## IV.

Mellon contends that the district court erred in granting summary judgment in favor of First Union, both on its breach of contract theory and its theory of fraudulent misrepresentation.[5]

### A.

On Mellon's breach of contract claim, the district court held that the parol evidence rule barred Mellon's attempt to use the alleged oral promises that First Union would not prepay its mortgage on the mall loans or "take care of" Mellon if it prepaid. The Restatement (Second) of Contracts § 213 (1979) defines the parol evidence rule as follows:

(1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.

(2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

(3) An integrated agreement that is not binding or that is voidable and avoided does not discharge a prior agreement. But an integrated agreement, even though not binding, may be effective to render inoperative a term which would have been part of the agreement if it had not been integrated.

*Id.; see* W. Jaeger, *Williston on Contracts* § 631, at 951–53 (3d ed. 1961).

"The parol evidence rule is a matter of substantive law." *Schoch v. First Fidelity*

---

**4.** This case was removed to federal court in April of 1988. Thus, the 1990 amendments to section 1441, which became effective on December 1, 1990, after this case had been appealed, do not apply. *See* Judicial Improvements Act of 1990, Pub.L. No. 101–650, § 312, 104 Stat. 5089, 5114 (1990).

**5.** Preliminarily, First Union asserts that Mellon's claims are barred under the applicable statutes of limitations. First Union raised the statutes of limitations defense in its answer, but the district court did not address the defense. *See Mellon Bank,* 750 F.Supp. at 713 n. 1. Mellon did not file its complaint until March of 1988. The statute of limitations in Pennsylvania for oral contracts is four years, *see* 42 Pa. Cons. Stat.Ann. § 5525(3) (Purdon 1981), while the

statute of limitations in Pennsylvania for fraud is two years, *see* 42 Pa.Cons.Stat.Ann. § 5524(7) (Purdon Supp.1991). First Union contends that Mellon's claims arose in September of 1983, when First Union prepaid its mortgages. Mellon contends that its claims arose in 1986 when Mellon, despite the contract's language, asked but was denied the right to prepay the One Oliver Plaza loan. Mellon thus contends that the statute of limitations had not run. The district court's order granting First Union's motion for summary judgment can be affirmed on the basis of the issues that court did address. Because the district court did not address the statute of limitations issue, we too decline to consider it.

*Bancorporation,* 912 F.2d 654, 662 (3d Cir. 1990) (citing *Betz Lab., Inc. v. Hines,* 647 F.2d 402, 405 (3d Cir.1981)); *see also Fr. Winkler KG v. Stoller,* 839 F.2d 1002, 1005 (3d Cir.1988) ("Despite its title, the rule is one of substantive contract law, and not one of evidence." (citation omitted)). Since the substantive law of Pennsylvania governs this diversity case, we apply Pennsylvania's version of the parol evidence rule.

The leading Pennsylvania case on the parol evidence rule is *Gianni v. R. Russel & Co.,* 281 Pa. 320, 126 A. 791 (1924). There, the Supreme Court of Pennsylvania wrote:

> Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract, ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence.
>
> The writing must be the entire contract between the parties if parol evidence is to be excluded, and to determine whether it is or not the writing will be looked at, and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing.

*Id.* 126 A. at 792 (internal quotations and citations omitted). Pennsylvania courts still rely upon *Gianni*'s definitive statement of Pennsylvania's parol evidence rule. *See In re Estate of Hall,* 517 Pa. 115, 535 A.2d 47, 55 n. 5 (1987); *Fountain Hill Millwork Bldg. Supply Co. v. Belzel,* 402 Pa.Super. 553, 587 A.2d 757, 760 (1991).

### 1.

The parol evidence rule is not applicable if the parties did not intend a writ-

ten contract to set forth their full agreement. *See Gianni,* 126 A. at 792; *see also American Bank & Trust Co. v. Lied,* 487 Pa. 333, 409 A.2d 377, 381 (1979) (parol evidence forbidden "for the purpose of varying or contradicting the terms of a contract which both parties intended to represent the definite and complete statement of their agreement"); *Fountain Hill,* 587 A.2d at 761 ("[i]t is clear that the parol evidence rule has no application to a writing that does not state fully the agreement among the parties."). The proper legal undertaking in determining whether a written agreement is the final and complete expression of the parties' agreement was outlined clearly in *Gianni:*

> When does the oral agreement come within the field embraced by the written one? This can be answered by comparing the two, and determining whether the parties, situated as were the ones to the contract, would naturally and normally include the one in the other if it were made. If they relate to the same subject matter, and are so interrelated that both would be executed at the same time and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing. This question must be determined by the court.

*Gianni,* 126 A. at 792, *quoted in Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 995 (3d Cir.1987); *see Crompton–Richmond Co.—Factors v. Smith,* 253 F.Supp. 980, 983 (E.D.Pa.1966), *aff'd,* 392 F.2d 577 (3d Cir.1967) (per curiam).

Thus, we must determine whether the two notes that unambiguously allowed First Union to prepay the mall loans and the one note that unambiguously denied Mellon the right to prepay its debt to First Union represent the complete and final agreement of the parties. To do so we first compare the written agreements and the alleged oral agreement between Mellon and First Union. They all cover the same subject matter—prepayment. The One Oliver Plaza note expressly prohibits prepayment by Mellon. The notes covering the mall loans allow prepayment by First Union. The alleged oral agreement dealt with

and directly contradicted the writings. Mellon's attempt to characterize Schofield's promise as a "hold harmless" agreement does not change its subject matter. Here, Mellon's argument that the two loans were "matched," *i.e.*, interrelated, perversely works against it. The evidence of interrelation Mellon relies on to show the importance of Schofield's promise to it demonstrates that the oral promise Mellon says Schofield made does "relate to the same subject-matter" and is "so interrelated that both would be executed at the same time and in the same contract." *Gianni*, 126 A. at 792.

We agree with the district court's holding that the written contracts between Mellon and First Union represented their full and complete agreement. The alleged oral agreement with respect to prepayment did not concern a separate matter but went to the "heart of the transaction" governed by the writing. *See Mellon Bank*, 750 F.Supp. at 714. If the parties intended to condition First Union's right to prepay its notes upon a reciprocal duty on First Union's part to put Mellon in a position roughly equivalent to the one it would have enjoyed if First Union had not prepaid the debts, Mellon and First Union would have naturally included that condition in the notes that evidenced their contract.[6] Accordingly, we, like the district court, hold that the parol evidence rule bars Mellon's attempt to introduce the oral promises it said Schofield made that Mellon could prepay its own debt if First Union prepaid its debts or that First Union would provide substitute security to prevent Mellon from suffering any financial consequences as a consequence of First Union's prepayment.

A number of Pennsylvania cases support our conclusion. In *Dunn v. Orloff*, 420 Pa. 492, 218 A.2d 314 (1966), Orloff gave Dunn a note in the amount of $25,000.00 payable upon demand. Orloff sought to prove that Dunn orally agreed to return the note once a corporation partially owned by Orloff had paid Dunn $5,000.00. *Id.* 218 A.2d at 315. The Court of Common Pleas of Philadelphia County did not allow Orloff to introduce proof of the alleged oral agreement, holding that it was barred under the parol evidence rule. *Id.* 218 A.2d at 316. The Supreme Court of Pennsylvania affirmed, writing that "[n]o case in Pennsylvania has ever gone so far as to permit the terms of a written contract to be altered or varied by such testimony." *Id.* 218 A.2d at 319 (internal quotations and citations omitted). Similarly, in *Sokoloff v. Strick*, 404 Pa. 343, 172 A.2d 302 (1961), in exchange for a fee simple interest in a parcel of real estate and cash, Sokoloff gave Strick a bond and mortgage in the amount of $25,000.00 and a judgment note in the amount of $10,500.00. Sokoloff brought suit seeking to have the bond, mortgage and judgment note declared null and void and attempted to introduce evidence that Strick said that the three documents were "no more than a matter of form and that neither [Sokoloff] nor [his] heirs would ever be called upon for payment thereof." *Id.* 172 A.2d at 303. The Supreme Court of Pennsylvania held that the parol evidence rule excluded such proof. *Id.* 172 A.2d at 306.

In *United Ref. Co. v. Jenkins*, 410 Pa. 126, 189 A.2d 574, 576 (1963), Jenkins gave to United a note that contained an unconditional promise to pay United $10,000.00. When United sued Jenkins on the note for nonpayment, Jenkins sought to introduce evidence that "the sole source of payment of the note" was proceeds of petroleum oil Jenkins was under contract to sell to United, even though the note was silent on the source of payment. *Id.* 189 A.2d at 577. The Court of Common Pleas of Washington County permitted the evidence, but the Supreme Court of Pennsylvania reversed. *Id.*

---

6. On this record, the absence of an integration clause does not affect our holding that the written agreements in this case are the final and complete expression of the parties' agreement. While the effect of an integration clause is to make the parol evidence rule clearly applicable, *McGuire v. Schneider, Inc.*, 368 Pa.Super. 344, 534 A.2d 115, 117 (1987), *aff'd*, 519 Pa. 439, 548 A.2d 1223 (1988) (per curiam order), it is not required. *See, e.g., Ralph Chapek, Inc.*, 828 F.2d 989 (finding of integrated agreement when no integration clause present); *cf. International Milling Co. v. Hachmeister, Inc.*, 380 Pa. 407, 110 A.2d 186, 191 (1955) ("The presence of an integration clause cannot invest a writing with any greater sanctity than the writing merits....").

189 A.2d at 579. The Supreme Court wrote:

> By the introduction of parol evidence Jenkins sought not to alter or modify this note but rather to destroy it[.] The court below should not have permitted the introduction on [sic] parol evidence to affect the terms of this note, complete on its face, in the absence of any averment of fraud, accident or mistake.

*Id.* (citation omitted).

Finally, we return to the Supreme Court's frequently cited decision in *Gianni*. There, the plaintiff, Gianni, contended that the owner of the building in which Gianni had leased space for a retail store orally promised that none of the building's other tenants would be given the right to sell soft drinks if Gianni promised not to sell tobacco products and paid a higher rent. Gianni claimed that the building's owner gave him these oral assurances a few days before they signed the lease and re-affirmed them at the time of signing. The lease that Gianni signed did prohibit him from selling tobacco, but it had no clause giving Gianni an exclusive right to sell soft drinks in the building that contained the leased premises. Shortly after this lease was signed, Gianni's landlord leased another part of the building to a drug store which sold soft drinks in competition with Gianni. Gianni sued his landlord and attempted to introduce the oral promises. *Gianni*, 126 A. at 791. The Supreme Court of Pennsylvania held that the parole evidence rule barred their consideration: "In cases of this kind, where the cause of action rests entirely on an alleged oral understanding concerning a subject which is dealt with in a written contract it is presumed that the writing was intended to set forth the entire agreement as to that particular subject." *Id.* 126 A. at 792.

These cases show that, under Pennsylvania law, a written contract which gives one party an unconditional right precludes the other party from using parol evidence to establish a condition on the exercise of the unlimited right the written text contains. Our opinion in *Wood*, an appeal in a diversity case applying Pennsylvania law, is not to the contrary. *See Wood*, 888 F.2d at 317. In *Wood*, we allowed evidence of an oral promise from Donnelley to Wood because the written contract Donnelley relied on as a bar to the introduction of parol evidence was between Donnelley and Continental Bank, not Wood and Donnelley. In the written contract, Continental Bank permitted Donnelley to draw upon a letter of credit guaranteed by Wood if Donnelley could show that Wood had defaulted on Wood's obligation to Donnelley. *See id.* at 317. Wood offered evidence to show an oral promise by Donnelley that Donnelley would not draw upon the letter of credit that Wood had guaranteed to cover more than one-third of any damages Wood's default caused to Donnelley. *See id.* at 314 & n. 2. We held that the parol evidence rule did not bar evidence of Donnelley's oral promise to Wood because there was no written agreement between Donnelley and Wood. *See id.* at 318.

In *Ralph Chapek, Inc.*, 828 F.2d at 994, we said that a written agreement setting forth the amount of compensation Chapek would receive represented the parties' complete agreement and held that the parol evidence rule barred evidence of a prior oral agreement modifying the compensation terms. Chapek argued that the prior oral agreement was evidence of a separate undertaking offered to supplement, not contradict the terms of the written agreement. *Id.* at 993. He relied on *Potoczny v. Dydek*, 192 Pa.Super. 550, 162 A.2d 70 (1960) (in banc), a decision factually similar to *Wood*. In *Potoczny*, as in *Wood*, the Superior Court of Pennsylvania held parol evidence was admissible to establish an agreement between A and B in the face of a written contract between B and C. The Superior Court held "that the writing between B and C '... was not intended to, and did not properly, state the full agreement between [A and B]. Consequently, it was permissible to receive parol testimony....'" *Ralph Chapek, Inc.*, 828 F.2d at 994 (quoting *Potoczny*, 162 A.2d at 74)). We held *Potoczny* was factually distinguishable from *Chapek*: "That situation is significantly different from the situation found here where Chapek seeks to alter the

terms of *its* written agreement with Hershey by adding still another term of compensation allegedly agreed upon prior to the parties' ... written agreement." *Id.* (emphasis added).

Neither *Wood* nor *Potoczny* help Mellon escape the parol evidence rule. Here, the written agreement is between Mellon and First Union, Schofield's promises were made on behalf of First Union and Mellon seeks to use parol evidence to vary the terms of its own contract with First Union. The district court did not err in holding that the written contract between Mellon and First Union was an integrated contract which the alleged oral promises would contradict.[7]

### 2.

■ Mellon alternately contends that if the oral promises Schofield made on First Union's behalf would normally be barred by the parol evidence rule, the fraud exception to that rule permits their use here. We have said that fraud is not an exception to the parol evidence rule. Rather, we recognize that evidence of fraud in the inducement will suspend the parol evidence rule because fraud prevents formation of a valid contract—"no contract, no parol evidence rule." *Betz Lab., Inc.,* 647 F.2d at 406; *see also Brentwater Homes, Inc. v. Weibley,* 471 Pa. 17, 369 A.2d 1172, 1175 (1977) (recognizing that parol evidence can render agreement invalid due to fraud); *Sokoloff,* 172 A.2d at 304 (same).

The purpose of the fraud exception to the parol evidence rule is to strike down the entire contract or "such part of it as is dependent on the fraud, if the balance of the contract can be sustained as enforceable." *Sokoloff,* 172 A.2d at 304; *Feuerstein v. New Century Realty Co.,* 304 Pa. 271, 156 A. 110, 111 (1931). Mellon has nowhere argued that fraud renders the written agreements in this case void or voidable or sought to rescind the contract on this ground. A party seeking rescission must act promptly to rescind once the fraud is discovered. *Levin v. Garfinkle,* 492 F.Supp. 781, 807 (E.D.Pa.1980), *aff'd.,* 667 F.2d 381 (3d Cir.1981) (per curiam). When a contract is induced by fraud, however, the injured party has a choice of alternate remedies: he may either rescind the contract or affirm it and maintain an action in deceit for damages. *Associated Hardware Supply Co. v. Big Wheel Distributing Co.,* 355 F.2d 114, 120 (3d Cir. 1965) (applying Pennsylvania law); *Nadolny v. Scoratow,* 412 Pa. 488, 195 A.2d 87, 89 n. 4 (1963); *National Bldg. Leasing, Inc. v. Byler,* 252 Pa.Super. 370, 381 A.2d 963, 966 (1977), *quoted in Briggs v. Erie Ins. Group,* 594 A.2d 761, 765 (Pa.Super.Ct.1991) (Brosky, J., concurring). Thus, we consider fraud only in connection with Mellon's tort claim for fraudulent misrepresentation.[8] The "fraud exception" to the parol evidence rule, to whatever extent it is recognized in Pennsylvania, is not properly before us in this case.

**7.** Accordingly, we need not resolve Mellon's contention that the district court erred in holding that adequate separate consideration did not exist to support First Union's alleged oral promise. We note, however, the following statement from our opinion in *Crompton–Richmond,* 392 F.2d at 577:

The only point advanced here that was not specifically dealt with in the opinion below is that parol evidence of oral commitments is admissible where, as here, they are supported by independent consideration, even though they may vary or contradict the writing. We do not think such is the law.

**8.** While a minority of jurisdictions have held that an action for fraudulent misrepresentation cannot be maintained when the promise itself falls within the parol evidence rule, the majority position is that the parol evidence rule does not

apply in misrepresentation cases. *See* William L. Prosser, *Law of Torts* 730 (4th ed. 1971) ("tendency is clearly to treat the misrepresentation action as a separate matter from contract"); *see also Levin,* 492 F.Supp. at 807 (evidence of promises barred by parol evidence rule on contract claim may be considered as proof of tort of misrepresentation). The Supreme Court of Pennsylvania has noted, but not decided the issue. *See Rempel v. Nationwide Life Ins. Co.,* 471 Pa. 404, 370 A.2d 366, 370 (1977). *But see Contractor Utility Sales Co. v. Certain–Teed Products Corp.,* 638 F.2d 1061, 1082 (7th Cir.1981) (citing *Rempel* for proposition that "Pennsylvania courts do not hold the parol evidence rule to bar introduction of evidence of [fraudulent misrepresentation]"). We assume for purposes of this opinion, without deciding, that the Pennsylvania Supreme Court would follow the majority rule.

### B.

Mellon, on its claim for fraudulent misrepresentation, argues preliminarily that the district court erred in even considering this claim because First Union did not expressly seek summary judgment on Mellon's fraud claim. First Union did, however, move for total, not partial, summary judgment and its argument on the inapplicability of the fraud exception to the parol evidence rule plainly affected Mellon's fraud claim. Mellon itself addressed the fraud claim in the district court in its brief in opposition to First Union's summary judgment motion and at oral argument on that motion. Accordingly, we reject Mellon's argument that it did not receive a fair hearing on its fraud claim.

Under Pennsylvania law, fraudulent misrepresentation has five elements, each of which must be proved by clear and convincing evidence. *See Delahanty v. First Pa. Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983). The elements are:

> (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as a proximate result.

*Id.* (quoting *Scaife Co. v. Rockwell–Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 454 (1971), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972)). Pennsylvania law requires "the trial judge [to] decide as a matter of law before he submits a case to the jury whether plaintiffs' evidence attempting to prove fraud is sufficiently clear, precise and convincing to make out a prima facie case." *Beardshall v. Minuteman Press Int'l, Inc.*, 664 F.2d 23, 26 (3d Cir.1981); *see Snell v. Commonwealth, State Examining Board*, 490 Pa. 277, 416 A.2d 468, 470 (1980).

The district court held that Mellon's fraud claim failed because: (1) there was no proof that First Union misstated its present intent and (2) Mellon's reliance on First Union's alleged promise was unjustified since both parties were sophisticated commercial entities and the transaction involved $48 million. *See Mellon Bank*, 750 F.Supp. at 717–18. We agree with the district court's holding that Mellon failed to set forth evidence sufficient to create a genuine issue of material fact on the intent element of misrepresentation. The district court held that Schofield's alleged promise involved acts to be performed in the future. Under Pennsylvania law, "promises to do future acts do not constitute a valid fraud claim." *Wood*, 888 F.2d at 318; *see Krause v. Great Lakes Holdings, Inc.*, 387 Pa.Super. 56, 563 A.2d 1182, 1187 (1989), *allocatur denied*, 524 Pa. 629, 574 A.2d 70 (1990); *Sokoloff*, 172 A.2d at 304 ("We have recently held more than once that a mere breach of good faith, or a broken promise to do or refrain from doing something in the future ... is not ... fraud." (internal quotations and citations omitted)).

In *Krause*, shareholders of a liquidated lender brought a claim for fraud against a corporation alleging that an agent of the corporation orally agreed, on behalf of the corporation, to assume responsibility for payment of a borrower's obligations under an installment note with the lender in consideration for which the shareholders agreed to accept a suspension of payments. *Id.* 563 A.2d at 1183–84. No payments were made under the note. The court found that the oral representation was a promise to do something in the future, and thus not a proper basis for a fraud action. *Id.* 563 A.2d at 1188. Similarly, in *Bank of Hooversville v. Sagerson*, 283 Pa. 406, 129 A. 333 (1925), the defendant had executed two judgment notes in favor of the plaintiff and the plaintiff entered judgment on them. The defendant petitioned the court to open the judgment on grounds that at the time the notes were executed, the plaintiff agreed not to execute on the judgment notes and requested them only as a matter of form. *Id.* 129 A. at 333–35. The Supreme Court of Pennsylvania held that the promise not to execute or enter judgment on the notes, and the subsequent use of them to enter judgment, did not constitute fraud. "An agreement regarding the doing or refraining from doing something in the future is not fraud...." *Id.* 129 A. at 335.

We agree with the district court that First Union's alleged oral promise not to prepay or to protect Mellon in the event of prepayment was a promise to do or refrain from doing something in the future. The facts of this case are not distinguishable from those in *Sagerson* or *Krause*. Mellon contends, however, that at the time First Union made its promise to Mellon, it had no intention of performing its promise. While a cause of action for fraud must allege misrepresentation of a past or present material fact, *Nissenbaum v. Farley*, 380 Pa. 257, 110 A.2d 230, 233 (1955), "[a] statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of fact." *Brentwater Homes*, 369 A.2d at 1175; *see College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200, 206 (1976); *Fidelity–Philadelphia Trust Co. v. Simpson*, 293 Pa. 577, 143 A. 202, 204 (1928); *DuSesoi v. United Refining Co.*, 540 F.Supp. 1260, 1273 (W.D.Pa.1982) (applying Pennsylvania law) (dicta). "The state of a man's mind is as much a fact as the state of his digestion." Prosser, *supra*, at 728 (quoting *Edgington v. Fitzmaurice*, 29 Ch.D. 359 (1882)).

Because Pennsylvania case law on this point is sparse, we turn to the Restatement (Second) of Torts. Section 530(1) of the Restatement (Second) of Torts states:

> A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.

Restatement (Second) of Torts § 530(1) (1977); *see Boulevard Airport, Inc. v. Consolidated Vultee Aircraft Corp.*, 85 F.Supp. 876 (E.D.Pa.1949) (citing First Restatement of Torts § 530 for same proposition). To come within Restatement (Second) § 530 the Bank had to produce evidence that at the time Schofield made his alleged oral promises he (1) "intended to prepay the mortgages *and*" (2) had no

intention of making other arrangements to "protect" Mellon. *Mellon Bank*, 750 F.Supp. at 716 (emphasis added). Non-performance does not by itself prove a lack of present intent. *Fidurski v. Hammill*, 328 Pa. 1, 195 A. 3, 4 (1937) (per curiam); *McCreary v. Edwards*, 113 Pa.Super. 151, 172 A. 166, 167–68 (1934) (in banc).

In *College Watercolor*, a fraudulent present intent was shown. There, Watercolor, Incorporated (Watercolor, Inc.) was in the business of reproducing original watercolor paintings under a registered trademark. Newbauer Incorporated (Newbauer, Inc.) sold the reproductions on behalf of Watercolor, Inc. Newbauer, the president of Newbauer, Inc. later individually contracted to buy Watercolor, Inc. paintings, telling Watercolor, Inc. that he wanted the paintings for his own personal satisfaction and for tax purposes. *College Watercolor*, 360 A.2d at 203. The evidence revealed, however, that at the time the parties entered the contract, Newbauer was already setting up his own operation for reproducing watercolors and intended to use the purchased paintings to devise a reproduction method. *Id.* 360 A.2d at 206. The court held that Newbauer knowingly misrepresented his intent in order to induce Watercolor, Inc. to sell him the paintings.[9]

Fraudulent intent was absent in *M. Leff Radio Parts, Inc. v. Mattel, Inc.*, 706 F.Supp. 387 (W.D.Pa.1988). In that case, a video game distributor (Leff) brought a fraud action against a manufacturer of video games (Mattel). *Id.* at 391–92. In September and November of 1983, Mattel sent out correspondence to its customers stating that rumors regarding its intention to abandon its video game business were false. Three months later, however, Mattel did abandon the video game business. Leff sought recovery on the theory of fraudulent misrepresentation alleging that Mattel's earlier statements regarding its intent not to abandon the video game business

---

**9.** *College Watercolor* was decided under the fraudulent misrepresentation sections of the Restatement of Contracts, rather than the Restatement (Second) of Torts. *See id.* 360 A.2d at 206. The provisions are, however, similar. *See* Restatement (Second) of Contracts Ch. 7 at §§ 424–46 (1979) (introductory note); *id.* § 171 reporter's note. The difference lies in remedy. Tort law awards damages for misrepresentation. A misrepresentation under contract law makes the contract void or voidable.

were false when made. Mattel produced evidence that it did not decide to sell the video games division until a task force recommendation regarding the continuing losses of the division was presented to and voted on by its Board in February 1984. *Id.* at 396. The court stated that in order for Leff to defeat Mattel's motion for summary judgment on this point, it must point to evidence in the record that created a genuine issue that Mattel's decision to sell its video games division was made prior to the task force recommendation in February 1984. The court found no evidence that Mattel's stated intent to its customers not to sell the business was false when stated. *Id.* at 398.

Statements of intention made at the time of contracting are not fraudulent simply because of a later change of mind. *See id.* at 397–98; *Fidurski*, 195 A. at 4 (promisor may find, "after mature investigation, that his promise was unfortunate"). A comment to the Restatement (Second) of Torts § 530(1) states:

> If the statement is honestly made and the intention in fact exists, one who acts in justifiable reliance upon it cannot maintain an action for deceit if the maker for any reason changes his mind and fails or refuses to carry his expressed intention into effect. If the recipient wishes to have legal assurance that the intention honestly entertained will be carried out, he must see that it is expressed in the form of an enforceable contract, and his action must be on the contract.

*Id.* comment b.

In accordance with these principles, the district court decided that the evidence of actions taken by First Union after the transaction was entered into was insufficient to show a present misrepresentation of First Union's intent. Mellon attempts to characterize the following passage from the record as a judicial admission by Schofield that First Union fraudulently intended to prepay from the beginning of the transaction:

> A [In February 1983] [w]e, First Union, filed a shelve [sic] registration with the SEC, regarding a possible $50 million public offering of securities. By this point in time, interest rates were starting to decline, and we felt that sometime during 1983, it might be appropriate to go out and borrow $50 million under a public offering and repay those two mall mortgages.
>
> . . . .
>
> Q I am asking how long before [February 1] did you start considering prepaying the mall mortgages?
>
> A I don't know. At least a couple of weeks.
>
> . . . .
>
> Q What occasioned [that idea]?
>
> A Decline of interest rates.

Jt.App. at 161–62. First Union's admission that it considered prepayment in February 1983 is unavailing. This date was a full year after the alleged promise was made, a much longer period than the three month passage of time in *M. Leff Radio*. Schofield was also able to point to a specific reason for its decision to prepay—a decline in interest rates.[10] Moreover, Mellon can point to no evidence in the record which raises a factual issue as to Schofield's present intent to renege on his promise to protect Mellon against a decline in interest rates if he did prepay the mall loans.

In any event, it is clear to us that Mellon has failed to show justifiable reliance on Schofield's alleged misrepresentation concerning his intent not to prepay unless he took steps to protect Mellon against the risk of a drop in interest rates. To avoid summary judgment, the Bank must produce sufficient evidence from which a reasonable jury could find that Mellon's reliance on Schofield's alleged oral promise was justified. *See Delahanty*, 464 A.2d at

---

**10.** As noted above, Mellon identified the time of injury or breach for statute of limitations purposes not as the time of prepayment, but as the time when Schofield refused to make alternative arrangements to protect the bank. The district court held that even if the Bank could show that Schofield intended to prepay before entering the transaction, it introduced "absolutely no evidence regarding when Schofield made the decision to refuse Mellon's attempt to prepay the note." *Mellon Bank*, 750 F.Supp. at 716.

1252. The Restatement (Second) of Torts § 544 defines reliance as follows:

> The recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out.

Restatement (Second) of Torts § 544 (1977); *see also* Restatement (Second) of Contracts § 171(2) (1981) ("If it is reasonable to do so, the promisee may properly interpret a promise as an assertion that the promisor intends to perform the promise.").

Even if the Bank's evidence were sufficient to show convincingly that First Union fraudulently misrepresented its intent, it does not show that the Bank had any reason to believe the oral promise would be carried out. Schofield told the Bank at the outset that he might want to prepay the mall loans if he sold a mall. Mellon, through its counsel, knew First Union required a prohibition against prepayment in the One Oliver Plaza loan to insure installment sale tax treatment of that transaction. Mellon also says it knew First Union wanted to remove any appearance of symmetry between the agreement for the sale of One Oliver Plaza and the shopping mall loans. The contrast between the two written prepayment provisions was plain. As stated by both parties, the difference in prepayment rights was a "deal-breaker" or "deal point." *See* Brief for Appellants at 15; Brief for Appellees at 4. To hold that Schofield's oral promises were legally enforceable against First Union would directly conflict with First Union's intent of avoiding any risk of adverse tax consequences.

The agreements in this case are between sophisticated businessmen. Mellon Bank is a major banking institution. After consulting with counsel at all stages of the transaction and closing on detailed written documents, it is not reasonable for Mellon to rely on oral promises that directly contradict the written agreements between the parties. *See, e.g., Josephs v. Pizza Hut of Am., Inc.,* 733 F.Supp. 222, 227 (W.D.Pa. 1989), *aff'd mem.,* 899 F.2d 1217 (3d Cir.

1990); *Dahath Elec. Co. v. Suburban Elec. Devel. Co.,* 332 Pa. 129, 2 A.2d 765, 766 (1938) ("If an exclusive agency in the territory covered was to be created, the thing which strikes one most forcibly after reading the contract is that, although it is a business agency agreement, entered into by business men, nothing is mentioned about the exclusiveness of the agency."). Moreover, the two Mellon officials Schofield allegedly made oral promises to never advised Mellon's board of directors, whose approval of the One Oliver Plaza transaction was required, of the promises.

Mellon, as well as First Union, never had any intention of closing these two related agreements on handshakes. When Mellon formally agreed to First Union's terms when it executed the agreement, it should have known it was left to First Union's good offices, not the law, to insulate it from market risk if First Union prepaid. Under the circumstances present here, we are unable to say Mellon could justifiably rely on a gentlemen's agreement not to do what the formal agreement gave one party, but not the other, the right to do. For all of these reasons, we hold the district court did not err in granting First Union summary judgment on both of Mellon's claims.

## V.

■■■ In its cross-appeal, First Union asks us to reverse the district court's order denying First Union's motion for sanctions against Mellon under Federal Rule of Civil Procedure 11. Rule 11 states, in relevant part:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause

unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11.

As noted above, we review a district court's ruling on a Rule 11 motion under the abuse of discretion standard. *Cooter & Gell,* 110 S.Ct. at 2461. In support of its appeal, First Union argues it should have been obvious to Mellon that the parol evidence rule would prevent success on Mellon's contract claim and that Mellon could not prove the elements of fraud by clear and convincing evidence. Thus, First Union contends that the district court abused its discretion in failing to impose Rule 11 sanctions upon Mellon.

We do not think the district court abused its discretion in failing to impose Rule 11 sanctions upon Mellon. The outcome of the breach of contract and fraudulent misrepresentation claims is not as clear as First Union seems to believe. Mellon had plausible arguments that the alleged oral promises did not fall under the parol evidence rule and that Schofield misrepresented his intent at the time he allegedly made the promises. Merely because those arguments failed to win the day does not warrant Rule 11 sanctions. *See Teamsters Local Union No. 430 v. Cement Express, Inc.,* 841 F.2d 66, 69 (3d Cir.) ("Rule 11 may not be invoked because an attorney, after time for discovery, is unable to withstand a motion for summary judgment."), *cert. denied,* 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988).

First Union's quest for sanctions is also hampered by its own conduct in pursuit of them. If Mellon's complaint contained claims so blatantly without merit that it was outside the realm of an informed exercise of discretion for the districtcourt to deny Rule 11 sanctions, one must wooter why First Union waited so long to seek such sanctions. Mellon initiated this suit in March of 1988. The district court obtained jurisdiction over it following its removal from the Court of Common Pleas in April of 1988. First Union answered the complaint on the merits and later, following the close of discovery, filed a motion for summary judgment. The district court granted First Union's motion for summary judgment on September 28, 1990. First Union, however, did not file its motion for Rule 11 sanctions until October 9, 1990, nearly two and one-half years after this suit found its way to federal court.

Not only was First Union's delay in seeking Rule 11 sanctions telling, but the delay was also in violation of the supervisory rule we announced in *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90 (3d Cir.1988). That principle requires a Rule 11 motion to be filed in the district court before the entry of final judgment. *Id.* at 100. In this case, First Union failed to do so. Thus the district court's denial of its Rule 11 motion can be upheld on this ground alone. *See Hilmon Co.,* 899 F.2d at 252 n. 1 (request for sanctions after entry of final judgment untimely). For all of these reasons, we will affirm the district court's denial of First Union's Rule 11 motion.

## VI.

 Underlining the acrimonious nature of this appeal, Mellon suggests that we impose damages under Federal Rule of Appellate Procedure 38 against First Union on account of First Union's appeal from the district court's order denying its motion for Rule 11 sanctions. Federal Rule of Appellate Procedure 38 states:

*Damages for Delay*

If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee.

Fed.R.App.P. 38.

We employ an objective standard in determining whether an appeal is frivolous. *See Hilmon Co.,* 899 F.2d at 253. We only impose damages under Rule 38 when an appeal is wholly without merit. *See Sauers v. Commissioner,* 771 F.2d 64, 70 n. 9 (3d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2286, 90 L.Ed.2d 727 (1986).

First Union had at least a colorable argument in favor of its appeal from the district court's denial of its Rule 11 motion. It also sought to distinguish the *Pensiero* case, contending that none of the reasons given

there in support of our supervisory rule should bar its appeal. Thus, we will not impose Rule 38 damages against First Union because its appeal from the district court's denial of Rule 11 sanctions against Mellon was not wholly without merit.

## VII.

We will affirm the district court's grant of summary judgment in favor of First Union on the complaint. We will also affirm the district court's order denying First Union's motion for Rule 11 sanctions. Finally, we will reject Mellon's suggestion that we impose Rule 38 damages against First Union on the cross-appeal. Each party shall bear its own costs.